**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CRIMINAL DOCKET NO.: 5:04CR65-1-V**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| vs. | ) | Memorandum and Order |
| | ) | |
| **MATTHEW JOHNSON,** | ) | |
|     Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant's Motion To Suppress and Memorandum In Support, both filed August 16, 2005, and Defendant's Supplemental filing of October 26, 2005.[1] (Documents #23, #24 and #31) Also before the Court is the United States' Response and Memorandum In Opposition, filed August 26, 2005. (Document #25)

On December 5, 2005, the undersigned presided over an evidentiary hearing. Evidence was presented and both parties were provided an opportunity for oral argument on the legal issues raised by Defendant's suppression motion. At Defendant's request, the Court allowed the parties to submit additional written argument in light of the evidence presented at the hearing. (Documents #37, #38) This matter is now ripe for resolution by the Court.

---

[1] Following the evidentiary hearing, Defendant wrote the undersigned directly. The Court received a letter from the Defendant dated December 6, 2005. It appears from the attached envelopes that the letter was mailed on or around December 7, 2005, returned as undeliverable, and then resent. The most recent postmark is December 22, 2005. Because this correspondence is not submitted by Defendant's counsel, and is not sworn testimony subject to cross-examination, the Court does not consider its contents.

1

## I. Facts

On November 18, 2004, Defendant Johnson was driving a dark green Honda with a Georgia tag on I-77 North. (12-5-05 Suppression Hearing Transcript, at 5.) Johnson was traveling 70 miles per hour in a 70 mile per hour zone in moderate to heavy traffic. (Hr'g Tr., at 6, 23.) The car appeared to be in proper working condition. (Hr'g Tr., at 23.)

Around 1:40 p.m., Sergeant William Byrd ("Byrd" or "Sgt. Byrd") of the Iredell County Sheriff's Department observed Defendant Johnson following a tractor trailer. (Hr'g Tr., at 5.) According to Byrd, Defendant was one-half to one car length behind the tractor trailer. (Hr'g Tr., at 5.) Sgt. Byrd initiated a traffic stop based upon his observation that Defendant was following too closely. (Hr'g Tr., at 5.)

After Defendant pulled over, Sgt. Byrd approached the driver's side of the dark green Honda and asked Defendant for his driver's license and registration. (Hr'g Tr., at 8.) Defendant produced a New York driver's license for a "Michael Johnson."[2] (Hr'g Tr., at 7, 9.) When Defendant handed over his driver's license, his hand was shaking. (Hr'g Tr., at 8.) Defendant also produced documentation showing that the Honda was registered to a "Reynaldo Echeverria." (Hr'g Tr., at 8-9.) Defendant stated that he only knew the owner of the car as "Ray" and that "Ray" was a friend of his sister's. (Hr'g Tr., at 11-12.) As Sgt. Byrd talked with Defendant, he observed a "rapid rise and fall" in Defendant's chest. (Hr'g Tr., at 7.) Sgt. Byrd testified that Defendant appeared to be very nervous and was constantly rubbing his neck. (Hr'g Tr., at 8.)

---

[2] Defendant is an illegal alien and admitted to using the name "Michael Johnson" in the United States. (Hr'g Tr., at 48.)

2

Defendant was asked to step outside of the car. (Hr'g Tr., at 9.) Sgt. Byrd asked Defendant if he had any weapons on him. (Hr'g Tr., at 18.) Defendant stated that he had a knife in the vehicle. (Hr'g Tr., at 18.) Sgt. Byrd patted down Johnson for his personal safety. (Hr'g Tr., at 9.) Byrd detected a one inch thick bulge during the pat down. (Hr'g Tr., at 9.) When asked about the bulge, Defendant Johnson said it was money. (Id.) Byrd later testified that he thought Defendant told him he was in possession of $2,800 cash.[3] (Hr'g Tr., at 18.) Sgt. Byrd advised Defendant that he wasn't going to give him a ticket but that he needed to run checks on Defendant's information in the patrol car. (Hr'g Tr., at 10.) Sgt. Byrd shook Defendant's hand and noticed that Defendant had sweaty palms. (Hr'g Tr., at 10.)

Sgt. Byrd and Defendant sat in the patrol car while Byrd checked Defendant's information against computer records.[4] (Hr'g Tr., at 9-10, 12, 19-20.) Byrd and Defendant engaged in small talk. (Hr'g Tr., at 10-15.) Defendant stated that he had moved to the Atlanta area about three weeks ago after his daughter's mother and he had split up. (Hr'g Tr., at 11.) Defendant reported he was staying with his sister who lived near Atlanta. (Hr'g Tr., at 11.) Defendant stated he was traveling to East Elmhurst, New York, to visit his daughter. (Hr'g Tr., at 11.) Defendant also volunteered that he had already been stopped

---

[3] This is one aspect of Sgt. Byrd's testimony that Defendant Johnson wrote the Court about. The actual amount of money Defendant had in his pants pocket (versus the total amount of money Defendant was in possession of at the time of arrest) is not clear from the record.

[4] Defendant testified that Sgt. Byrd never ran any checks on Defendant's license or car registration but then admitted on cross examination that he had stepped out of the car to retrieve the other warning ticket and didn't observe Sgt. Byrd run any checks. (Hr'g Tr., at 43, 46-47.)

3

twice before that day in South Carolina. (Hr'g Tr., at 10.) Defendant was issued a warning ticket during one of the earlier stops and retrieved his copy of the ticket from the Honda for Officer Byrd. (Hr'g Tr., at 10, 40.) Defendant continued to appear nervous and rub his neck. (Hr'g Tr., at 11.)

While they were seated in the patrol car, Byrd used a code ("Signal 9") to request backup.[5] (Hr'g Tr., at 14-15, 33.) Sgt. Byrd told Defendant he was going to check the VIN # in the car.[6] (Hr'g Tr., at 13.) Byrd did not make any attempt to view the VIN plate on the dash but chose instead to inspect the VIN plate on the driver's side door. (Hr'g Tr., at 13-14.) While inspecting the VIN plate, Sgt. Byrd noticed the smell of fabric softener sheets. (Hr'g Tr., at 14.) Sgt. Byrd confirmed that the VIN # matched the information on the registration. (Hr'g Tr., at 13-14.)

Byrd wrote Defendant a warning ticket for following too closely. (Hr'g Tr., at 15.) Sgt. Byrd returned Defendant's license and the car registration to him. (Hr'g Tr., at 15, 43.) After the warning ticket was issued, Sgt. Byrd told Defendant to have a good trip and Defendant was released. (Hr'g Tr., at 15.) Defendant exited the patrol car and began towards the Honda. (Hr'g Tr., at 15, 43-44.)

---

[5] Byrd explained that a "Signal 9" code indicates to the other law enforcement officer that assistance is requested because the officer using the code would like to conduct an automobile search. (Hr'g Tr., at 33.)

[6] There is some question whether Defendant gave consent to Sgt. Byrd to check the VIN #. The testimony given by both Sgt. Byrd and the Defendant, along with the tape recording of the exchange, tends to show that Byrd made an affirmative statement as opposed to asking a question. Byrd testified: "I asked him – I told him I was going to go up and check the VIN on the vehicle to make sure it coincided with the registration and he said okay." (Hr'g Tr., at 13.) Defendant testified that Byrd told him he was going to check the VIN. (Hr'g Tr., at 42.) The tape recording from Byrd's patrol car is consistent with the testimony in that there is no inflection (as if asking a question) in Byrd's voice.

4

After Defendant had taken a few steps, Sgt. Byrd exited the patrol car and called out to the Defendant. (Hr'g Tr., at 44.) Defendant turned around and Sgt. Byrd approached the Defendant. (Hr'g Tr., at 44.) Sgt. Byrd asked Defendant if there was anything illegal in the car - any guns, drugs, or large sums of U.S. currency. (Hr'g Tr., at 15.) Defendant responded in the negative. (Hr'g Tr., at 15.) Byrd asked for consent to search the green Honda. (Hr'g Tr., at 15.) Defendant said he had already been through this a couple of times and advised he had "no problem" with it. (Hr'g Tr., at 15.)

At some point prior to Defendant authorizing the search, Sgt. Chad Elliot arrived on the scene.[7] Byrd left Defendant at the front of the patrol car and advised Sgt. Elliot that he had obtained consent to search. (Hr'g Tr., at 15.) Defendant yelled to Sgt. Byrd and asked if he could go relieve himself. (Hr'g Tr., at 16.) Byrd told him that would be fine. (Hr'g Tr., at 16.) Defendant went up to the wood line, relieved himself and came back. (Hr'g Tr., at 16.)

Sgts. Byrd and Elliot began to search the green Honda. (Hr'g Tr., at 16.) About two minutes into the search, Byrd discovered a hidden compartment in the driver's side quarter panel.[8] (Hr'g Tr., at 16.) After locating the hidden compartments, Sgt. Byrd employed the canine to see if the dog detected any drugs. (Hr'g Tr., at 21.) Sgt. Byrd indicated during the hearing that if the dog alerted, his plan was to search the compartments. (Hr'g Tr., at

---

[7] According to Defendant, he was aware of Sgt. Elliot's presence when he gave consent to search. (Hr'g Tr., at 44.)

[8] Sgt. Byrd explained that a "hidden compartment" refers to any modification made to a vehicle "after market" (or not by the manufacturer), for the purpose of concealing contraband. (Hr'g Tr., at 4.)

5

21.) Byrd located 6 kilos of cocaine and a .380 pistol.[9] The kilos of cocaine were wrapped in dryer sheets. (Hr'g Tr., at 29.)

## II. Legal Issues

1) Whether the traffic stop was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place? Terry v. Ohio, 392 U.S. 1 (1968).

2) Whether Sgt. Byrd's conduct would have communicated to a reasonable person that he was free to decline the officers' requests or otherwise terminate the encounter? Florida v. Bostick, 501 U.S. 429 (1991).

3) Whether the Fourth Amendment violation pursuant to New York v. Class based upon the opening of the car door to view the VIN on the doorjamb renders the subsequent consent search invalid? New York v. Class, 475 U.S. 106 (1986).

## III. Discussion

### A. The Initial Traffic Stop Was Supported By Probable Cause Of A Traffic Violation

According to the Defendant, the initial traffic stop was unlawful because it was not supported by reasonable suspicion or probable cause. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996)(*citing* Delaware v. Prouse, 440 U.S. 648, 653 (1979)(Pennsylvania v. Mimms, 434 U.S. 106, 109

---

[9] Sgt. Byrd was not asked about the rest of the search or the end result during the hearing.

(1977)).

In this case, Sgt. Byrd testified that he observed the Defendant following a tractor trailer ahead of him too closely. See N.C. Gen. Stat. §20-152.[10] Although Officer Byrd was not confident of the exact distance, he testified that Defendant was approximately ½ to 1 car length, or 15 to 20 feet, behind the truck. (Hr'g Tr., at 5-6.) According to Byrd, following too closely is one of the number one causes of accidents on the interstate. (Hr'g Tr., at 5.) Sgt. Byrd stated that a good rule of thumb for determining a safe following distance is to maintain a distance of approximately one car length for every ten miles an hour in speed. (Hr'g Tr., at 6.) Byrd stated that this rule of thumb is consistent with what is recommended in driver's education. (Hr'g Tr., at 6.) Byrd opined that the dark green Honda should have been at least 6 car lengths behind the tractor trailer. (Hr'g Tr., at 6.) Sgt. Byrd explained that Defendant was following at a distance that appeared to be unsafe.[11] (Hr'g Tr., at 6.) The Court finds Officer Byrd's testimony credible.[12] Officer

---

[10] Section 20-152 reads:

(a) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

[11] Defendant attempted to discredit Officer Byrd by asking for precise measurements and calculations relative to what would be considered a "reasonable and prudent" following distance. Yet, in Delaware v. Prouse, the Supreme Court recognized that "[t]he foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations." Delaware v. Prouse, 440 U.S. at 659.

[12] During the suppression hearing, Defendant denied that he was tailgating or doing anything different than any other car on I-77. (Hr'g Tr., at 39-40.) According to Defendant, the cruise control was set at 70 miles per hour; he was approaching another vehicle in the right lane; and ended up switching lanes, presumably, so that he could maintain his speed. (Hr'g Tr., at 38.) Initially, Defendant claimed that he had not been following any tractor trailer truck. (Hr'g Tr., at 39.) On cross examination, Defendant admitted that the video of the traffic stop

Byrd's observations and sworn testimony provides a sufficient and lawful basis for the traffic stop under North Carolina law.

Moreover, Defendant's contention that Sgt. Byrd, a trained interdiction officer, may have actually decided to pull Defendant over "as part of a drug interdiction effort" or with "a larger view towards finding contraband" is entitled to no weight. (12/5/06 Hr'g Tr., at 22.) First, there is no evidence that Byrd's stated purpose in stopping Defendant was pretextual. Byrd testified that there were no other "indicators" that caused him to initiate the stop. (Hr'g Tr., at 22-23.) Secondly, it is well-settled that even if there were evidence of a pretextual stop, Sgt. Byrd's subjective intentions are irrelevant as long as the traffic stop is consistent with due process. Whren, 517 U.S. at 811-814 (holding that the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved); Maryland v. Macon, 472 U.S. 463, 470-71 (1985)("Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," and not on the officer's actual state of mind at the time the challenged action was taken.); United States v. Robinson, 414 U.S. 218, 221 n.1 (1973)(a traffic-violation arrest not rendered invalid by the fact that it was "a mere pretext for a narcotics search.")

Finally, the statute's failure to specify an exact "safe" distance does not render §20-152 unconstitutionally vague, nor Officer Byrd's actions arbitrary.

---

showed a truck in the left-hand lane in the distance ahead. (Hr'g Tr., at 45.) Defendant then stated that he didn't recall being behind a tractor trailer. (Hr'g Tr., at 45.) The Court observed on the videotape a tractor trailer truck proceeding as described by Sgt. Byrd as Defendant was pulled over.

## B.  Sgt. Byrd Did Not Exceed The Scope Of The Lawful Traffic Stop / Reasonable Suspicion That Defendant Was In A Stolen Vehicle Justified Defendant's Continued **Detention**

Defendant further contends that even if the traffic stop was lawful, Sgt. Byrd exceeded its lawful scope by continuing to detain Defendant after issuing the warning ticket.  According to Defendant, "but for" the allegedly illegal search of the car - opening the driver's side door to view the VIN sticker - Sgt. Byrd would not have detected the dryer sheet odor giving rise to his suspicion that Defendant was transporting drugs.

Ordinarily, the Supreme Court's analysis in Terry v. Ohio[13] governs routine traffic stops.  United States v. Meikle, 407 F.3d 670, 672 (4th Cir.2005)(*citing* Berkemer v. McCarty, 48 U.S. 420, 439 (1984)).  Terry requires the Court to determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Id. (*quoting* Terry, 392 U.S. at 20.)  During a routine traffic stop:

> "The officer may request a driver's license and vehicle registration, run a computer check, and issue a citation.  When the driver has produced a valid license and proof that he is entitled to operate the car, [the driver] must be allowed to proceed on his way, without being subject to further delay by police for additional questioning."

United States v. Rusher, 966 F.2d 868, 876 (4th Cir. 1992)(*internal citations omitted*).  "Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime."  Id.

---

[13] Terry v. Ohio, 392 U.S. 1 (1968).

Further questioning unrelated to the purpose of the initial traffic stop is permissible under the following circumstances: 1) if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or 2) if the traffic stop has become a consensual encounter. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (*citing* Rusher, 966 F.2d at 876-77; United States v. Sullivan, 138 F.3d 126, 131 (4th Cir. 1998)).

Defendant relies heavily on United States v. Caro, 248 F.3d 1240 (10th Cir.2001). In Caro, the officer had completed the tasks associated with a routine traffic stop. The officer had already verified that the VIN # displayed on the dash of the car matched the registration. The officer purportedly took the additional step to verify the VIN# on the inside of the car because 1) the color of the car was different than reported on the registration; 2) Defendant could not remember the car owner's last name; and 3) Defendant allegedly acted nervous. The Tenth Circuit reversed, holding that the trooper's actions exceeded the permissible scope of the detention and violated the Defendant's Fourth Amendment rights. Caro, 248 F.3d at 1247. The Tenth Circuit also held that the Defendant's consent did not provide a basis for upholding the illegal search.

Defendant's reliance on Caro is misplaced. In Caro, the Tenth Circuit expressly limited its holding - not basing its ruling on the Trooper's alleged lack of reasonable suspicion that Caro's car might have been stolen or that the valid dashboard VIN dispelled that suspicion. Caro, 248 F.3d at 1246. The Tenth Circuit explained that even after examining the dashboard VIN and determining that it matched the registration, the Trooper could have continued to *detain and question* Caro based upon his reasonable suspicion

of a stolen vehicle. Id., at 1246-47 (*emphasis in original*).

Although Sgt. Byrd did not initially have any suspicion that the car was stolen, he testified that Defendant's relative lack of knowledge regarding the owner of the car, as well as the length of the trip, was suspicious. (Hr'g Tr., at 28.) In this case, the following facts heightened the officer's suspicion and justified the length of the stop:[14]

- When Defendant handed over his driver's license, his hand was shaking (Hr'g Tr., at 8.);
- The car was registered to a Reynaldo Echeverria of Duluth, Georgia, but Defendant was licensed in New York (Hr'g Tr., at 7,8.);
- Defendant stated that a male friend of his sister's that he only knew as "Ray" owned the car (Hr'g Tr., at 12.);
- Defendant purportedly had possession of the Honda for a significant period of time but did not know much about the owner of the car (Hr'g Tr., at 12.);
- Defendant's chest was rising and falling rapidly (Hr'g Tr., at 7.);
- Defendant was rubbing his neck (Hr'g Tr., at 8, 10-11.);
- Defendant had sweaty palms (Hr'g Tr., at 10.);
- Defendant appeared overly nervous (Hr'g Tr., at 8.);
- Defendant was traveling from a known narcotics hub (Hr'g Tr., at 12.);
- Defendant's actual route taken - Interstate 40 (but purportedly traveling from Atlanta, Georgia to New York) - was not the most direct (Hr'g Tr., at 13.); and
- While checking the driver's side door / VIN sticker, the officer smelled a strong odor consistent with fabric softener sheets (Hr'g Tr., at 14.)

---

[14] The total time of the traffic stop (from Sgt. Byrd's first contact with the Defendant up until Sgt. Byrd requested consent to search the Honda) was about 14 minutes. (Hr'g Tr., at 16.) Defendant doesn't appear to challenge the actual length of the stop as much as he questions whether Sgt. Byrd's actions were within the lawful scope of the traffic stop.

An articulable and reasonable suspicion that Defendant may be in possession of a controlled substance existed upon Sgt. Byrd's detection of the fabric softener or dryer sheet scent.[15] For the reasons explained, *infra*, namely, that the encounter became a consensual one, the Court need not find that reasonable suspicion existed absent consideration of this evidence or prior to its discovery.[16] (*See* Sections "III, C & D")

**C. The Encounter Between Sgt. Byrd And The Defendant Became Consensual After Defendant's Release From The Traffic Stop**

Defendant also challenges the validity of his alleged consent authorizing Sgt. Byrd's search of the green Honda. The Court finds that Defendant's consent provided the legal justification for Sgt. Byrd's actions after completion of the traffic stop. Once the initial stop has taken place, the driver may be asked by the officer whether he consents to a search of the vehicle. If it is determined that the traffic stop becomes a consensual encounter, Florida v. Bostick governs and there is no need to consider whether the officer exceeded the scope of the stop under Terry. Florida v. Bostick, 501 U.S. 429 (1991); United States v. Meikle, 407 F.3d 670, 672 (4th Cir.2005); Rusher, 966 F.2d at 877.

Employing a totality of the circumstances test, the Supreme Court in Florida v. Bostick described the appropriate inquiry as follows: "whether a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter."

---

[15] Fabric softener or dryer sheets are known by law enforcement for their use in the illegal drug trade as a mechanism for masking the smell of cocaine.

[16] Sgt. Byrd's testimony indicates that his reasonable suspicion changed as he gathered more information and developed more indicators. For instance, Byrd's developing suspicion was that the Honda might be stolen. It was not until he detected the dryer sheet scent that he developed reasonable suspicion that Defendant might be transporting drugs.

12

Rusher, 966 F.2d at 877 (*citing* Bostick, 501 U.S. at 439-440.)  Fourth Circuit precedent is consistent with this objective approach.  "Circumstances where a citizen would feel free to go, but stays and has a dialogue with the officer are considered consensual."  United States v. Weaver, 282 F.3d 302, 309 (4th Cir.2002).   Further, "[w]hen a stop is over and its purpose served . . . mere questioning by officers without some indicated restraint, does not amount to a seizure under the Fourth Amendment."  Sullivan, 138 F.3d at 131.

In Meikle the Fourth Circuit found that the traffic stop had become a consensual encounter once the officer had returned the driver's papers to him and it had become clear that the driver could leave.  Meikle is directly on point in that the driver in that case was walking back to his car when the officer called out to him and asked whether he could speak with him again.  Applying Florida v. Bostick, the Meikle panel found it crucial that 1) the officer had returned the license and registration; 2) the officer had shaken the defendant's hand; and 3) Defendant had begun walking back to his car.  Meikle, 407 F.3d at 673-74.  The Fourth Circuit stated, "Meikle understood that he was free to leave, which is made obvious by the fact that he shook hands with the officer and did in fact begin to leave."  Id.

The record here is consistent with the key facts found by the appellate panel in Meikle.  When Sgt. Byrd asked Defendant for consent to search, Defendant had possession of his documentation and was returning to the Honda.  The fact that Defendant had exited the patrol car and begun walking towards the Honda tends to show that an objectively reasonable person would have understood that he was free to go.   In fact, Defendant was not physically restrained in any way and was left unattended twice as

opposed to being placed in the patrol car or directed to stay with law enforcement. Defendant was left alone by the patrol car while Sgt. Byrd went to greet Sgt. Elliot. (Hr'g Tr., at 15.) After giving consent, and prior to the search, Defendant was allowed to walk by himself to the edge of the woods to relieve himself. (Hr'g Tr., at 16.) Defendant's ability to move about the area freely and independently establishes that an objectively reasonable person would have understood that he was free to go and not under the control of law enforcement. Defendant's statements and subjective beliefs are not enough to rebut the undisputed evidence on this issue.[17]

Again, it is not the officer's intent or purpose that is relevant. Ohio v. Robinette, 519 U.S. at 37; Whren, 517 U.S., at 812-13. According to Defense Counsel, the fact that Defendant was not *actually* free to go requires the Court to find in Defendant's favor.[18] However, Defendant did not know what Sgt. Byrd's intentions were. As already discussed, there was nothing about Byrd's conduct that objectively indicated a restraint on Defendant's departure.

---

[17] During the suppression hearing, Defendant's statements were inconsistent. Defendant first testified that he did not feel like he was free to leave. (Hr'g Tr., at 44.) However, Defendant later admitted that he was actually in the process of leaving and did, in fact, feel free to go at one point. (Hr'g Tr., at 47.)

[18] Sgt. Byrd testified that based upon Defendant's behavior and information gathered during the traffic stop, he made the decision to request consent to search before he checked the doorjamb VIN plate. (Hr'g Tr., at 16.) Byrd also testified that he intended to use the drug canine with or without consent from Defendant. (Hr'g Tr., at 21.)

**D. The Voluntary Nature Of Defendant's Consent Authorizing The Subsequent Search Of The Car Renders The <u>Class</u> Violation Constitutionally Permissible**

In New York v. Class, the Supreme Court upheld the warrantless search of a car interior for purposes of removing papers obstructing the view of the dashboard VIN#. New York v. Class, 475 U.S. 106, 119 (1986). The Court concluded that the inspection of the VIN "is within the scope of police authority pursuant to a traffic violation stop." Class, 475 U.S., at 115; Sprouse, 440 U.S. at 659. The Court also concluded that there was a lack of reasonable expectation of privacy in *either location* of the VIN.[19] Class, 475 U.S. at 118. However, the Court cautioned that "[i]f the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it." Id., at 119. Although the Court deemed the search of the car's interior to be a Fourth Amendment violation, the search was found to be "constitutionally permissible" in light of the lack of reasonable expectation of privacy in the VIN, the minimal level of intrusiveness of the officer's actions, the concern for the officer's safety, and the fact that law enforcement had observed the defendant commit traffic violations. Id., at 18.

For purposes of resolving Defendant's motion, the Court accepts that Sgt. Byrd's search of the car's doorjamb for the VIN# constituted a violation of the Defendant's Fourth Amendment rights but finds that Defendant's voluntary consent nonetheless remedied the violation. *See* United States v. McGill, 125 F.3d 642 (8th Cir.1997)(assuming Fourth

---

[19] In cars manufactured prior to 1969, VIN plates are located on the left doorjamb. Class, 475 U.S. at 108. However, cars manufactured after 1969 are required to have a VIN plate on the dash that can be viewed by looking through the windshield. Id., at 112 (*quoting* 49 C.F.R. §571.115 (S4.6)(1984)).

Amendment violation under *Class* but finding valid consent for subsequent search). "Even if consent is the result, in a "but for" sense, of a Fourth Amendment violation, the consent will validate a subsequent search if the consent is "sufficiently an act of free will to purge the primary taint." McGill, 125 F. 3d at 644. "That question turns on whether [the Defendant] understood his right to withhold consent, the temporal proximity of his consent and the prior Fourth Amendment violation, the presence of intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct."" Id. (*quoting* Brown v. Illinois, 422 U.S. 590, 603-04 (1975)).

The test set out in McGill is satisfied. First, the Court reiterates that Defendant's own words were that he had "no problem" with Sgt. Byrd searching the car. (Hr'g Tr., at 15.) In addition, Defendant conceded that he believed he was free to go, at least momentarily, after Sgt. Byrd told him to have a good trip and allowed him to exit the patrol car to return to the Honda. The temporal proximity of the Fourth Amendment violation and consent is relatively close. In terms of intervening circumstances, Sgt. Elliot's presence does not alter the Court's analysis because absent some evidence of coercion, the fact that there were 2 law enforcement officers on the scene is insignificant. Likewise, if anything, the issuance of the warning ticket and conclusion of the traffic stop served to reassure Defendant that he was free to decline Sgt. Byrd's request to search. Most importantly, the benign nature of the Fourth Amendment violation weighs in favor of denying Defendant's motion. Sgt. Byrd testified that his purpose for opening the car door to compare the VIN# on the doorjamb to the information on the car registration was to see if the VIN plate had been removed or tampered with. (Hr'g Tr., at 21.) Sgt. Byrd elected

16

to check the doorjamb VIN rather than the one on the dash because it was more likely that a stolen car's VIN would be scratched out on the doorjamb as opposed to the dashboard VIN. (Hr'g Tr., at 14.) Thus, Sgt. Byrd's purpose in opening the car door and inspecting the doorjamb VIN was to discover information that would either confirm or negate his suspicion that the Defendant was not lawfully in possession of the car. Similarly, there is no evidence of any flagrant or egregious misconduct on the part of Sgt. Byrd.[20] While Sgt. Byrd's view of the doorjamb VIN encroached upon the car's interior and constituted a search, there is no evidence that Sgt. Byrd did anything other than open the door and inspect the VIN plate. In Class, the Supreme Court found this type of Fourth Amendment violation only minimally intrusive. Class, 475 U.S., at 118 ("The "critical" issue of the intrusiveness of the government's action, also here weighs in favor of allowing the search. The search was focused on its objective and no more intrusive than necessary to fulfill that objective.") Here, Sgt. Byrd accomplished his objective and did not use the opportunity to conduct a broader search than necessary. Therefore, any "taint" that occurred as a result of Sgt. Byrd's conduct is purged by the Defendant's voluntary consent.

### IV. Order

**IT IS HEREBY ORDERED** that Defendant's Motion To Suppress is **DENIED**.

---

[20] Defense counsel conceded there is no evidence of any bad faith and that Sgt. Byrd was only trying to do his job. (Hr'g Tr., at 52, 55.)

Signed: February 21, 2006

*Richard L. Voorhees*
Richard L. Voorhees
Chief United States District Judge